

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00463-CV

_____

IN THE INTEREST OF P.L., A CHILD

_____

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-702420-21

_____

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant R.B. (Mother) challenges the trial court's order terminating her parental rights to her son, P.L. (Paul).[1] In one issue, she argues that the evidence is insufficient to establish that termination of her parental rights is in Paul's best interest. Because we hold that the evidence is sufficient, we affirm.

## I. Background

The Department of Family and Protective Services filed a petition for conservatorship and for termination regarding Paul. The Department's petition sought termination of Mother's parental rights based on the predicate statutory grounds in Texas Family Code Section 161.001(b)(1)(D), (E), (K), (L), (M), (N), (O), (P), (Q), and (R). *See* Tex. Fam. Code Ann. § 161.001(b). The Department also sought termination of the parental rights of Paul's father, G.L.[2] The case was tried to the court on November 11, 2022. At trial, the Department put on testimony from Department investigator Ruth White, Father, and caseworker Shontavia Hill. Mother also testified.

Paul was born on June 25, 2021, and was taken into the Department's care on June 29, 2021, and White testified about the basis for the Department's involvement.

---

[1]We use pseudonyms for the child and his parents to protect the child's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2]The trial court terminated Father's rights, but Father did not appeal that termination.

- The Department received a report that at Paul's birth, Mother had tested positive for amphetamine and marijuana and that Paul's umbilical cord blood had tested positive for methamphetamine and amphetamine.

- Paul's meconium also tested positive for marijuana, amphetamine, and methamphetamine.

- When White met with Mother and Father at the hospital to discuss the test results with them, Mother said that she did not know why she would test positive. She admitted to using an edible form of marijuana early in her pregnancy but denied any other drug use.

- Father also denied drug use and asked if he could take Paul home if he passed a drug test, so White administered an oral swab drug screen. That screen was positive for methamphetamine and amphetamine.

- Both parents stated that they were willing to do further testing, so White arranged it. Mother completed a hair follicle test in July 2021 that was positive for methamphetamine and marijuana.

- White further testified that the parents' parental rights to another child had previously been terminated in Oklahoma. In that case, Mother's termination was based on relinquishment. Additionally, Mother's right to two other children had previously been terminated.

According to Paul's hospital birth records admitted at trial, meconium begins to form between the twelfth and sixteenth week of gestation, and meconium drug testing can detect maternal drug use during the last four to five months of pregnancy. The records also stated that the umbilical cord tissue testing for methamphetamine "is intended to reflect maternal drug use during approximately the last trimester of a full-term pregnancy." Similarly, the test of the umbilical cord tissue for cannabis is designed to detect exposure occurring "during approximately the last trimester of a full[-]term pregnancy, to a common cannabis (marijuana) metabolite." Thus, the

3

positive test results of the umbilical cord tissue and meconium indicated that Mother had used drugs during the latter part of her pregnancy.[3]

Shontavia Hill is a caseworker with Our Community Our Kids, which provided conservatorship services in this case. Hill testified about the parents' service plans and each parent's performance of their plan.

- Mother completed many of her services, including drug treatment. She completed that drug treatment in July 2022.

- However, Mother's service plan required her to submit to random drug tests as requested by the Department, and although the plan stated that her failure to test could indicate a positive result, Mother failed to comply on multiple occasions. As White had also testified, Mother completed a hair follicle test in July 2021, and that test was positive for methamphetamine, amphetamine, and marijuana. Mother complied with Hill's urine drug testing requests in July, August, September, and October of 2021, and each time her test was positive for marijuana. She refused to provide hair follicle drug testing in October 2021 and failed to comply with a urine test or a hair follicle test each month from November 2021 to June 2022, even though Hill explained to her "what the ramifications of that are."

- At an April 2022 permanency review hearing, Mother was ordered by the trial court to participate in a nail bed or hair strand test before trial, but Mother did not comply. She was arrested in June 2022, released in July, and arrested against in August, and she could not participate in drug testing while incarcerated.

- Mother's June 2022 arrest was for two offenses: fraudulent use and possession of identifying information and possession of methamphetamine. For both offenses, she was placed on five years' deferred adjudication on October 17, 2022.

---

[3]The medical records also stated that Mother had not had any prenatal care while pregnant with Paul.

- Mother's October 2022 release was shortly before trial, and she never completed the ordered nail bed or hair strand testing. She did, however, complete a urine test in July 2022, and that test was positive for marijuana.

- Hill further testified that Paul had suffered from "extreme withdrawals," which "just slowed down in March 2022."

- Hill expressed concerns that Mother's drug use impaired her ability to be a safe parent. Hill explained that Mother was not stable and had not been stable for the entire case and that she was still in a relationship with Father, who also used drugs and had refused to do any services.[4] Asked what she meant by "not stable," Hill elaborated that Mother had been living with "paternal grandfather,"[5] but that she and Father were put out of that home. They then moved in with "paternal uncle." The Department had concerns about drug usage and prostitution in that home, but Mother and Father continued to live there nevertheless.

- As of October 24, 2022, Mother was living at Safe Haven. Asked if Paul would be allowed to live there with Mother and if it would be an acceptable place of residence for Paul, Hill stated, "As far as I know, yes."

- Hill stated that Mother had been fired from a job during the case but continued to tell Hill that she was working for that employer.

- Hill stated that Paul's foster parents were meeting his developmental, medical, educational, and financial needs. The foster parents are interested in adopting Paul. Paul has no special needs.

- Hill testified to her opinion that it is in Paul's best interest for the Department to be named his permanent managing conservator, "pending a hopeful adoption by his current foster parents."

- On cross-examination, Hill stated that during Mother's visits with Paul, Mother treated Paul appropriately, and Hill had no concerns about Paul's safety during the visits.

---

[4]Hill testified about the multiple services that Father had failed to complete.

[5]It is unclear whether Hill meant Father's paternal grandfather or Pauls' paternal grandfather (i.e., Father's father).

Father testified about his other children, his criminal history, and his failure to perform his services.

- Father has six other children aside from Paul. His oldest child lives with her mother in Oklahoma. His second child also lives with her mother in Oklahoma. His third child lives with that child's mother in Texas. Father could not remember the name of his fourth child. His fifth child lives with that child's mother in Texas. His sixth child is his other child with Mother.

- Father has been arrested four or five times in Oklahoma. He has previously been convicted of possession of methamphetamine, of burglary, and of obtaining a controlled dangerous substance by a forged prescription. At the time of trial, he had a pending charge for intentionally or knowingly threatening imminent bodily injury to Mother, based on events that occurred after Mother's October 2022 release from jail.

- Father denied that there was a service plan in place for him, and he contended that he had never been told that any services were mandatory.

Mother testified about the services that she completed, her employment and living situation, and her drug use and testing.

- She stated that she had been working as a housekeeper for a hotel, but she was let go because they would not let her return to work without a doctor's note after her C-section. The same day, she applied at another hotel and got a job there. She worked there for approximately seven months. She left that job to work for All Star Healthcare Services as the caretaker for Father's uncle. She did that work until her June 2022 arrest.

- In July 2022, after her release from jail, she began her own cleaning business. Since October 24, 2022, she has been staying at Safe Haven, which has adequate facilities for her to have Paul with her. She testified that she would be able to provide Paul with a safe place to live if he was returned to her.

- Father assaulted Mother on October 22, 2022, a few days after her release from jail, and he was currently incarcerated.

6

- She explained that she had not done the ordered hair strand drug test because her hair was too short, and "if they would've done it [she] would've had like a bald spot on [her] hair," "so [she] ha[d] been growing it out."

- She said that Father had moved out of his uncle's house in February 2022 and did not return until she went to jail in June, so from February to June, she and Father were not living together.

- Mother began using methamphetamine in 2013.

- She had not been to any NA meetings since her release from incarceration on October 18, 2022.[6] She claimed that she had not used methamphetamine since before she was pregnant, but she admitted using marijuana in August 2022. She said that she had missed her drug tests because the social worker "kept changing the locations of the places, and [she] didn't understand that": "where I was going at first was perfect for me because it was right where I could go from the house to drug test and then go to work. . . . [O]ne [location] was in Weatherford, the other one was . . . in Arlington," which was "just out of the way."

- Mother does not have access to her bank account because while she was in jail, she had "signed over [her] property to [Father] so he could pay to get [her] bond out," and Father had locked her out of her account.

- Mother has five children aside from Paul, none of whom are still in her care. Her oldest was adopted in a private adoption. Her second child lives with that child's father. Her third child and fourth child were adopted by foster parents in Oklahoma. Her fifth child is her other child with Father.

The trial court found the predicate termination grounds in Section 161.001(b)(1)(D), (E), (O), and (R), and it found that termination was in Paul's best interest. On appeal,

---

[6]Mother's service plan did not require her to participate in NA, but she was required to build a support system, and NA was suggested in her service plan as one possible way for her to do that.

Mother's sole issue asks whether the evidence is legally and factually sufficient to support the trial court's best-interest finding under Section 161.001(b)(2).[7]

## II. Standard and Scope of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove by clear and convincing evidence a predicate statutory termination ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see also id.* § 161.003(a); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

Both legal and factual sufficiency require us to determine whether a reasonable factfinder could form a firm belief or conviction that the best-interest finding is true. In reviewing a best-interest finding, we consider the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In determining the legal sufficiency of the evidence supporting the finding, "the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder

---

[7]Mother also challenges the sufficiency to support a best-interest finding under Section 161.003(a)(5), but the trial court did not make a finding based on that subsection and did not terminate Mother's parental rights under Section 161.003. *See* Tex. Fam. Code Ann. § 161.003(a).

resolved disputed facts in favor of the finding." *Id.* at 630–31. That is, we consider the evidence that supports the best-interest finding, and we consider undisputed evidence even if it contradicts the finding, but we ignore evidence that a factfinder could reasonably disbelieve. *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (quoting *In re J.F.C.*, 96 S.W.3d 256, 268 (Tex. 2002)). If, under this standard, a reasonable factfinder could form a firm belief or conviction that the finding was true, then the evidence is legally sufficient. *A.C.*, 560 S.W.3d at 631.

In reviewing factual sufficiency, we weigh "disputed evidence contrary to the finding against all the evidence favoring the finding," and we "consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* at 631; *J.F.C.*, 96 S.W.3d at 266; *see also In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *A.B.*, 437 S.W.3d at 503 (quoting *J.F.C.*, 96 S.W.3d at 266).

### III. Discussion

#### A. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development.

*A.C.*, 560 S.W.3d at 631. Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *E.C.R.*, 402 S.W.3d at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest, as set out in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[8] These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Application

As Mother notes in her brief, she put on evidence that she behaved appropriately with Paul during her visits, she completed her court-ordered services, she put on undisputed testimony that she is self-employed, and she has stable housing. This evidence relates to Mother's parenting ability and her ability to provide

---

[8]Those factors are (1) the child's desires, (2) the child's current and future emotional and physical needs, (3) the current and future emotional and physical danger to the child, (4) the parental abilities of the individuals who are seeking custody, (5) the programs available to assist those individuals to promote the child's best interest, (6) those individual's or the Department's plans for the child, (7) the home or proposed placement's stability, (8) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (8) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72; *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807.

a stable home for Paul, and it is some evidence weighing against the best-interest finding.

As for evidence about Paul's current placement and the Department's or foster parents' future plans for Paul, the Department put on only conclusory evidence. However, although "[e]vidence about placement plans and adoption are, of course, relevant to best interest," "the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor." *C.H.*, 89 S.W.3d at 28. Paul is an infant and thus cannot be asked about his desires regarding his placement, but the trial court could consider the fact that he has spent minimal time with Mother. *See In re K.L.*, No. 14-22-00584-CV, 2022 WL 17844266, at *12 (Tex. App.—Houston [14th Dist.] Dec. 22, 2022, no pet.) (mem. op.) (stating that "[w]hen children are too young to express their desires, the fact finder may consider that the children are bonded with their current placement, are well cared for by them, and have spent minimal time with the parent").

Mother's brief does not, however, address her drug use. She put on some explanation for her failure to complete many of her requested drug tests during the case, including the court-ordered testing, but the trial court was not required to find credible her explanation. She did not testify that getting to the assigned locations would have been impossible, and she did not testify about any attempt on her part to request a different testing location or to explain to her caseworker about any difficulties she had in getting to the assigned testing locations. She testified that she

11

did not submit to the court-ordered hair strand test because she did not want a bald spot in her hair, but even if that were a sufficient explanation, she did not explain why she could not have submitted to the alternative nail bed test. As Hill testified, under the service plan, Mother's failure to drug test could be considered a positive result.

Mother claimed that she had not used methamphetamine since before her pregnancy, but she provided no explanation for why the baby's cord blood and meconium tested positive for that substance, why Paul suffered from withdrawal, or why she was arrested for possession of methamphetamine. The trial court did not have to find her denial of drug use credible. *See In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021). Further, she admitted to using marijuana a few months before trial—after she had already completed her drug treatment program—when she knew her parental rights were at stake and while she was on deferred adjudication for a drug possession offense.

Mother's drug use during pregnancy affected Paul's health, resulting in his suffering from serious effects that lasted from his birth in late June 2021 until March 2022. Mother's drug use during pregnancy and her continued drug use during the case is conduct that has already endangered Paul and threatens Mother's ability to care for him, and it can support a finding that the parent–child relationship is improper. *In re Z.F.*, No. 07-21-00138-CV, 2021 WL 5770174, at *6 (Tex. App.—Amarillo Dec. 6, 2021, no pet.) (mem. op.). (noting that "[s]tability and permanence are paramount in the upbringing of children" and that "[a] parent's drug use demonstrates an inability

to provide a stable environment for the children and an inability to provide for the children's emotional and physical needs"); *In re T.R.*, No. 02-20-00359-CV, 2021 WL 1421423, at *6 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.) (considering mother's drug use during pregnancy in best-interest analysis); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (holding that drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being). Further, based on the evidence presented at trial about Mother's history of drug use, the trial court could find that her drug use would continue into the future. *See K.L.*, 2022 WL 17844266, at *13. "The trial court could have reasonably based its best-interest finding on Mother's pre-removal drug abuse and her decision to continue the pattern" during her pregnancy with Paul and even after the removal and "could have reasonably determined that the continuing drug abuse overshadowed any evidence in Mother's favor." *See In re D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *13 (Tex. App.—Fort Worth Dec. 22, 2022, no pet. h.) (mem. op.).

Further, Mother's commission of criminal offenses during the case—knowing her parental rights were at stake—resulted in her June 2022 arrest, and after she was released in July, she was arrested again in August. Additionally, drug use, including the use of marijuana, is a violation of her deferred adjudication probation conditions. Violating probation conditions is an act that could result in revocation of her deferred adjudication, and based on the trial evidence, the trial court could have serious

13

concerns about Mother's ability to comply with her probation conditions and thus with her ability to provide a stable home for Paul now and in the future. These acts weigh against Mother's ability to provide a safe and stable home for Paul. *See M.R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *4 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (considering in best-interest analysis fact that father committed an offense at a time when his parental rights were in jeopardy); *see also In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *16 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) (stating that a parent's criminal history is relevant in analyzing the present and future emotional and physical danger to a child and the parent's ability to provide a safe and stable home for the child).

Applying the appropriate standards of review, we conclude that legally and factually sufficient evidence supports the trial court's best-interest finding. We overrule Mother's issue.

## IV. Conclusion

Having overruled Mother's sole issue on appeal, we affirm.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: March 30, 2023

14